Second case, number 142145, Hall v. Greystar. May it please the Court, I'm Leslie Stellman. I represent L. Hall, a disabled citizen of this country who lives in Maryland and who was for over six years living successfully and peacefully, more or less, in an apartment rented from what is now Greystar, but had a predecessor company. During those years, because of her disability, and she had never once missed a rental payment, she was extremely, it was an intelligent woman who had a very significant corporate career behind her, and these disabilities obviously impacted her greatly, but she had a service dog. That led to some complaints, and the landlord, and she, through counsel, in 2009, worked out a service dog arrangement through a settlement. That settlement was just working fine until Greystar, the appellee in this case, came along, purchased these apartments in Maryland, in the Towson, Maryland area, and immediately began to breach and abrogate the agreements. In doing so, they, among other things, took over a storage area that she had by agreement, access to use through a pretext, and then made a number of other efforts to evict her. All along the way, she made it very clear that she was engaging in complaints pursuant to the Fair Housing Act. She went to HUD, the Housing Urban Development folks, and filed a formal HUD complaint. She went to the Maryland Commission, what was then called the Maryland Commission on Human Relations, it's now called the Maryland Commission on Civil Rights, filed a formal complaint. She committed probably the most obvious form of protected acts under the Fair Housing Act one could do, not simply complaint, but actually file complaints and charges, for which a series of retaliatory actions are detailed in both an original complaint we filed and an amended complaint. This case is about, as so many cases turn out to be ever since the Twombly and Iqbal cases came down some years ago, access to the court. In Tennessee v. Lane, we all know that was about physical access to a courthouse, and the Supreme Court was so upset with denying disabled people access to the court that they actually blew through the 11th Amendment immunity enjoyed by the state in order to give access to the court. This is another more subtle form of access. In Larry Tribe's recent book called Uncertain Justice, the Roberts Court, he spends a lot of time talking about the Iqbal and Twombly cases. The good news about Iqbal and Twombly is I think they've been sort of figured out recently by the Supreme Court in a per curiam that went back to roots. The roots in this case, Sorkowitz v. Surima. While this case is not about purely disability, it's really more about retaliation. And Sorkowitz, of course, was about discrimination under Title VII. The courts seem to look to the same thing. But I will let the court know first that retaliation is not fundamental disability discrimination. It is much broader. And in fact, 704A, which is the Title VII version of retaliation, which in Nassar v. University of Texas was very narrowly construed as a but-for test, this is a broader one that goes beyond the usual kind of retaliation in civil rights cases, but includes intimidation and coercion. It's explicit in the statute. What we have here is a complaint that was very thorough. This complaint followed Sorkowitz, is what we thought was the Sorkowitz example of what you need to do. And even Iqbal and Twombly made it clear it's not about conclusory allegations. It's about facts. This case is loaded with facts. We have a complaint that lays out the entire history of the acts of retaliation, the concerted effort she made to engage in protected activity under the Fair Housing Act. Because this is what I was looking for. So if you can be really specific, what are the factual allegations in the complaint that, if true, would show causation? I see the activity and I see what you allege are the retaliatory acts in response, but what are the facts that show the causal link between the two? Well, all of the series of facts, and we'll start with the basic complaint, not the amended complaint, which Judge Berdorf essentially forced on us we had to do to keep the case alive. But originally the facts start with all of the protected activity and all of the acts that they committed to violate her rights as a disabled person under the Fair Housing Act. At some point, then they explain that she went to court through an eviction. And during that process, following the process of the eviction, they treated her property in such a way as to violate not only the local code governing evicted tenants, but they essentially went beyond and destroyed this property. That was ten months later, is that right? No, not at all. And I think there's some confusion about the proximity between the protected activities. The most recent protected activity was Ms. Hall standing in a courtroom three weeks before the eviction, in November of 2011, and saying, Your Honor, I'm a victim of retaliation. This eviction is retaliatory and, in fact, I have a lawsuit pending that will be tried in February of next year, only a few months away, in our state courts. Well, she's saying that's retaliation. She's not saying that that going into court about eviction is protected activity. We'd have very different discrimination laws if that was the case. That in and of itself is not protected activity. Well, she has the right. Sure, she has a right, but it's not protected for purposes of discrimination laws. Well, Your Honor, with all due respect, I understand protected activity, for example, in the Title VII arena to be very, very broad. And if you look at Thompson v. National Steel, and you look at all of the cases that defied protected activity, it includes any utterance to an employer, and in this case a landlord, of a disagreement with the way you're being treated based on your protected status. So she was in court in an eviction matter. Her lawyer made it very clear in front of Graystar's lawyer that she is disabled. You've already kicked out her dog or essentially made her life impossible because of the dog, and now you're evicting her because she's engaged in complaining about the way she's treated as a disabled person. That to me was the protected activity that was asserted within three weeks prior to the eviction in December of 2011 that included the destruction of all her property. So I believe there was protected activity that was close in time. But even if it wasn't, one could infer from the complaint. If you look at the complaint on A14, A15, you look at the story that goes on as to what happened to her property, her personal property. You look at A12 and A13, you look at the basis for which she sought to protect her property. She made arrangements during the eviction. And then at the very end on page A15 and A16 where we start the counts, we explain that they were aware of her protected activity. She engaged in it. They were malicious and took adverse action by ordering that the property that in question be transported and destroyed, even though she made it clear she had arrangements with the deputy sheriff. So basically you're saying that sort of the story that you tell in the complaint, you don't actually have to show that they don't do this to everyone. You don't even have to allege. This is different from what usually happens. It's sort of plain on its face that something this inconsiderate could not happen but for some kind of ‑‑ Precisely, Judge Scherz. This is where we have the inferences. And even this court in the McCleary case. And more recently there have been other cases that followed in this court and in the district courts in Maryland and other states in the Fourth Circuit where they said you can draw from inferences, draw logical, sensible inferences using, in one court called it common sense of the judge, to assume that there is a causation between the two. The words because of, which are the magic words that somehow the police want us to use, have actually been used to reject under 12B6 complaints looking just like this. Because because of our ‑‑ I just really want to clarify my question. I'm not concerned that the complaint doesn't say because of. I'm not concerned about any failure, kind of a formal failure to say it happened because of. My concern is I don't see the facts allege that if true would show the causation. I'm not worried about the failure to say it. I'm worried about the failure to plead facts that show it. I just want to make sure you're focused on the right thing. Okay. I think these facts clearly add up to causation. You've got the protected activity. You've got the adverse action. You've got the maliciousness. Try me again on the protected activity. Protected activity was complaining and even hiring a counsel to sign a settlement agreement with respect to the service dog. That when that service dog agreement was breached by Gray Star repeatedly, including through the destruction of property, there was a precursor to this moment when in 2010 they destroyed property that belonged to her that was in a storage area. She complained again, then filed a HUD complaint and a Maryland State Human Relations complaint. Which were rejected. What's that? Which were rejected. Which were rejected. But the fact that they were rejected does not mean, and I think this court recently suggested in questioning the Jordan doctrine, Jordan versus alternative resources, just because at the time they were rejected doesn't mean that the acts of retaliation weren't committed. She in good faith believed, even under the Jordan versus alternative resources, a case that has been highly questioned in the civil rights bar, even if you accept that, it was in good faith she made these complaints. And, therefore, these complaints constitute protected activity. And I think the fact that The argument is that because they were all in the constant furthering her addressing grievance based on her disability. Correct. That's correct, Your Honors. They were grievances addressing her disability and the final blow Which case is closest to yours in espousing that theory? The theory that, which theory? I thought just in response to my colleague, you just said that all of these acts you think were because of her disability, even though you haven't said that, and that she was treated differently, that they wouldn't have had the same approach to someone else who they believed had violated the lease, or they wouldn't have been able to terminate the lease of someone else. And so what case would be closest to that? Well, following McCleary, there have been some cases that essentially suggested that you don't need to have this precise wording of No, no, no, again, I'm not after the wording. I'm after the, as I understand it, your theme is that this, that your client is disabled, and she had a disagreement with her landlord, and every piece of disagreement was because of her disability, and what, even though you haven't alleged that, and therefore she was treated differently than other people, other tenants who didn't have a disability. So there's no pleading here about other clients, other people that No, no, because Judge Motz, again, this isn't a disability case. This is a retaliation case. So the focus is not on how she was treated because of her disability, although that's, those are facts that are helpful as historical background. It's about why she was treated as she was on account of having protected, engaged in the protected acts of making these complaints. The case is on point. There's a recent case out of North Carolina Federal Court. There's Wright versus North Carolina that came to this circuit that said the complaint was adequate enough. It was broad enough to imply this causation, even in the absence of magic words. That's a voting rights case. I remember it well. I figured you would. Judge Motz right here. She can tell you what it means. If I'm going to sum up on this point, Johnson versus City of Shelby, every so often the Supreme Court sneaks in a per curiam, and I love it. This is a nine-member unanimous per curiam last November of 2014, Johnson versus City of Shelby, where they said, look, don't get caught up in the Twombly-Iqbal concern. It's the plausibility. I think we have plausibility here that there is indeed, no question, but that she was retaliated because of protected activity, and I think count one of our complaints. Both complaints clearly shows that. I'm sorry I don't have time to talk about conversion. I would like to briefly mention that, but very quickly, Johnson said that Swierkiewicz is still controlling law throughout the land and that all we're looking for are facts that get you beyond the plausibility test of Iqbal, and if you do that, don't worry about conclusory assertions such as causation, showing that because of. And again, I think because of is troublesome. You don't need it, in fact, that you lose on that. Even in the Bass case of this court, the word because of wasn't good enough. It's all about the facts, and I think our facts are powerful and lead to an inference that Judge Berdar seriously failed to make. Very quickly on two other points, on the conversion point, Judge Berdar just contradicts himself. He basically says, well, on conversion, first, I think he misreads the Baltimore County Code. He does no analysis of that code. He doesn't suggest that maybe he had a look at the legislative intent, the history, other cases. He doesn't do a thing. Instead, he just says, I read the plain meaning of this statute that says it's abandoned, and then he realizes, well, at least it's not abandoned if it was taken from around a vehicle and it's not coming right out of the apartment, and that's in his second ruling. But what he keeps forgetting along the way is that this property is also subject to the first section of the Baltimore County Code, which says it needs to be placed on the premises as close to the landlord's property as possible. Shall is in that statute, and Maryland courts use shall very seriously, as Judge Motzwell knows from your experience on our appellate courts. And he ignores that, blows right by that, and goes to the last piece of the statute or the code, which says it's considered abandoned. He doesn't do much of an analysis. Maybe that's where and that's why we believe perhaps he should have certified the question without our even having to ask to our high court to get a better answer. Last point, if I could please make it, although my light's red, and that's with respect to the sheriff. Have you reserved time for rebuttal? I'm reserving a little time, but I'd just like to take one minute. You can use it now or in rebuttal. I'd like to use one minute now, and then I'll save the rest for rebuttal. It's just about the sheriff. The sheriff was, in fact, following a court order until he wasn't. What he wasn't doing was following a court order at the time that he abrogated an agreement with my client to allow her to move her stuff to a pod nearby.  At that point, he exceeded his authority and qualified immunity is lost. I'm done. Thank you very much. Thank you very much. Good morning. May it please the court. I'm Michael Skojak. I'm the attorney for Graystar Management Services. I'd like to advise the court that we're splitting up the argument so that I'll be addressing the fair housing claim. Mr. Bautista will be addressing the conversion claim, and Ms. McDonald from the Attorney General's Office will be talking about the immunities and related matters. On the fair housing claim, Judge Harris, as you correctly asked, the same question that we've been asking since this case started, and that is, tell us what the facts are that show causation. The fact that Ms. Hall repeatedly brought complaints for discrimination, repeatedly raised discrimination concerns in court actions when her lease was terminated and things like that, and as the record shows, Judge Motz, as you correctly pointed out, every time the judges or the investigators found no discrimination. And there's this long history of this, and yet there's no tie of this history to what happened on the day of the eviction. All of the events that occurred that are being discussed, if they were brought as discrimination claims, they would all be barred by the statute of limitations because they would have worked more than two years prior to the complaint. So instead we have this one-day eviction event, and then sweeping back and trying to capture all this so-called protected activity without explaining how it really is tied together. I mean, there were several court orders in a whole series of months. How would you explain the tie, that you admitted that you were doing it because of retaliation? I mean, that normally doesn't happen in cases like this, right? People normally don't say, I'm doing this because I'm retaliating. What tie do you want? Weren't her complaints basically, for example, about the dog, right? The dog shed, was that a problem, right? There were other residents who complained about the dog, and yes. Did she have the dog because of her disability? Yes, Your Honor. Okay, that was tied to it as well. So that's what she's claiming, that she was sort of the fly in the ointment, if you will, because she was complaining about things that related to her disability. That was six years before these events. So we have the whole issue that we argue in the briefs about temporal ties to show that the events are connected. It wasn't continuous. I mean, six years, and there was nothing else about her disability at all? Nothing else about the service animal, no, Your Honor. But about her disability, nothing about the disability. No, there were other events. What was the most recent one? Well, as counsel indicated, she did raise in her eviction action, there was a district court case to get a warrant of restitution, and then she took an appeal to the circuit court. At the circuit court hearing, she raised the issue that it was related to her disability and that this was a retaliatory eviction. The transcript from that court hearing has been submitted, and the judge said there was not one shred of evidence to support that in order that the eviction go forward. She also then filed a petition for a stay of enforcement of the eviction, and that was denied. So if those are characterized as protected activity, then that would be the – Well, something that – I'm not sure that they are protected activity, because it seems to me they go to whether she is going to be able to keep her home because of various problems with her landlord. But 10 months before, she filed some sort of anti-discrimination action, right? She filed a HUD complaint, yes, Your Honor. And so that was a protected – Possibly 10 months, and again, that was denied. But – and that also is 10 months back in time before the eviction action. And as we point out in the briefs, if you look at Title VII cases, when you get out to beyond four, five, six months, there's no temporal tie that connects those things. So in that respect, if that's the protected activity, we would argue that there's no temporal connection. Ms. Hall had several – excuse me. Yeah, let me just – so it does – I mean, as I've been trying to wrestle with, it does seem like what we're missing here is some allegation that not everyone is treated this way. This was really unusual, what happened at the eviction. But then I do wonder, I mean, is it sufficiently – just on its face, it does seem very odd. Why did they take this stuff all the way to Pennsylvania? Why couldn't – I mean, is this routinely done? Someone says, oh, I have a storage pod a few blocks away. I'm like, nope, we're going to dump it in Pennsylvania. Why would a thing like that happen? It's wherever landfills have openings and can take trash. So it could be many miles away. It could be close to home. That's sort of irrelevant to what happened. It is not unusual in that sense. You would rather throw her stuff away than to let her take it to a pod nearby? That seems cruel. Well, Your Honor, she had had much notice, many months. Doesn't that seem cruel? You mean to tell me, I'm going to take your 15,000 pounds of furniture into another state before I allow someone who's right there to say, I have a pod nearby. That doesn't seem cruel to you? Your Honor, she had many months to move out of the apartment. She no longer legally lived there. We needed to get possession. We gave her an extension of time. Counsel, how is that inconsistent with your possession, just to allow the lady to take her stuff to a pod nearby? In spite of all the things and frustrations you had, that's what the nuances of the human experience is when we talk about something being cruel. And that is, in spite of all of that, why couldn't she just take her stuff to a pod nearby? Instead, you add insult to injury. We're going to take it to a junk pile out of the state somewhere and throw your 15,000 pounds of furniture away. Your Honor, if I could. Yes, please. You're assuming that what she pled is all true. And I could argue the facts. Don't we do it? Doesn't the law require that a little bit? Yes, but for causation, you've got to look at the complaint, the four corners of the complaint, and say, does what she alleged here have the elements of a claim? What you're contending is that something that my client did was a bad act, a wrong thing, and it may very well be that the way she characterized it is a wrong thing, and if we had a chance to present opposite facts? No, it's relevant to show that maybe that 10 months ago is still fuming in your head. That's why it's relevant. It's still fuming in your head to the point that you could do something that seems on its face cruel, very cruel. Your Honor, for six years, as counsel has alleged, she had opportunities time and time again to raise claims of discrimination, which were denied, and had her opportunity to exercise her rights, and then at the very last moment, the eviction, when we now have the opportunity to get possession of her apartment back and she is going to move away and no longer be interacting with my clients, it's alleged that we then decided to retaliate and take action against her property. To me, I mean, under the test in McCleary Evans and Iqbal and Twombly, there must be a plausible claim of relief, and that includes causation, and the fact that this could happen to every resident at that property and it wasn't because of her disability is an important issue here. Is that sort of your representation? Like, sure, this seems really cruel and unnecessary, but that is, in fact, what we do to everyone. We're just that kind of landlord. No, I would suggest we don't do it to anyone, and if we could go through the facts in this case, not that I want to go through discovery, but if we do, I think that we will find that many of those facts are not true, just as the fact that the complaint talks about all the allegations of discrimination,  I gather your answer to this last series of questions is, okay, maybe if, and you, court, have to accept the allegations that the complaint is true, and so that gets her only that we acted rudely at the end, but we were giving her, you also have to take into account the fact that she has pled towards this eviction, that we gave her extra time, that when we went into court we said we're not going to do it right away, we kept giving her extensions of time, and that is evidence that there wasn't any connection with discrimination. Maybe everybody got irritated at everybody. Absolutely, Your Honor. You've stated it better than I do. And maybe we didn't act like perfect gentlemen. It was because we were irritated at her for all of these delays at the end, and not because of any discrimination. But if that's your argument, maybe we're not allowed to make that inference. Well, Your Honor, I think it still comes down to being a pleading case, and there are elements you have to plead. The cases we've cited are very clear about that, and under Twombly and Iqbal, you've got to state the elements to put together a plausible claim for relief. And you basically go back to that there isn't any protected activity more recently than ten months before. And no tie of any of the protected activity to what happened on that day, whatever happened that day. It was an eviction action, and we don't know exactly what happened, but it could have been for a variety of reasons. It could have been that some contractors made some mistakes. And eviction actions are often not happy. They're not happy. And to go to Judge Gregory's point, every day in Baltimore where I work, I see people's things on the street, and it is cruel. It's terrible that it happens to people. But landlords can't have piles of debris in their parking lot, so that's why there's the Baltimore County Code that makes sure that it's not on public property and the landlord's got to do something to take care of it. And the statutes give them legal rights to move it. And, you know, so I guess it's cruel in a moral sense. It's not cruel in a legal sense. Thank you very much. Thank you, Your Honor. Good morning. Andrew Batista. May it please the Court. I represent PSN Landscaping. As has been indicated by Mr. Skojic, I'm here to discuss the conversion issue. PSN Landscaping was the company hired by Graystar to move the things out of the apartment, into the truck, off to the dump. With regard to Judge Bredar's first opinion, I think the complaint alleged that my clients had taken things out of the apartment, moved them onto their truck, and had also taken a purse and some other items that were returned to Ms. Hall. Based upon that, Judge Bredar found that the property was abandoned as per the Baltimore County statute. That statute, I think, and Mr. Stoneman spoke to it briefly, finds that property removed from the lease premises in accordance with a properly issued warrant of restitution shall be considered abandoned. There's no question that the warrant of restitution here was appropriate and proper, so that property is abandoned per se. The statute also speaks in terms of putting the items on the landlord's property in place designated that is needed by the landlord. As Mr. Skojic, I think, speaks to somewhat here, is that is not designed to create a bailment or any kind of duty on behalf of the landlord to the tenant. It's a duty on behalf of the landlord to the rest of society that we not put this stuff in the street in everybody else's way, that the landlord not get in everybody else's way. It's more of an anti-littering statute, if you will. I don't think those two things link up the way Mr. Stoneman had indicated to the court. In the amended complaint, there is a very minor change with regard to these boxes, and that change is that the plaintiff alleges in paragraph 23, J.A. 211 to 213, that a large amount of file boxes were placed around her own vehicle and that of her housekeeper. And she goes on to indicate in paragraph 27 of the complaint that they were unable to intercept those file boxes before they were placed on trucks and then goes on to state in paragraph 28 that those boxes. Counsel, let me get you out of the papers a little bit. Certainly. If, as you say, the property is abandoned, what's the status of your company the moment you crossed the threshold and took it outside? What's the status of your company to the property? You say it's not a bailment. What is your status, legal status? What is the status of PSN Landscaping? Yes. The moment you take it from her apartment, what is your status as to respect to the property? We're on the property as agents or as directed by Graystar. Actually, what's the status as to the property? The property is abandoned. So what's your status as to the property? I'll ask again. That's the property's status, abandoned. What is your status with respect to the property? We're in possession of the property. Oh, you're in possession? Well, we're holding the property as we take it. You're in possession as fiduciary? No. Why not? It's abandoned. It's abandoned property. So who would be a fiduciary to? That's why I asked. So it's yours then. It's your property. Because you are holding abandoned. If it's abandoned, if you're in possession, you own it, right? I think that would be correct, yeah. Okay. So you at the point, you own the property. So is your position then that she couldn't even get it from you at that point? It's abandoned property. That's per the law. I don't think that's a. So in other words, if she was standing right there as you took each piece out, she said, Give that to me. I have a truck right on my truck. She couldn't do that either, could she? I don't think she would have an enforceable right. And I don't know if there's any. So who determines whether or not she can have it? You? Your discretion? Well, I don't think she has an enforceable right. I said who. Do you have discretion to determine whether she can have it or not? That's my question. I would think, yeah, they would. Okay. So it's totally your. Under the analysis. I'm sorry. I almost. You're saying it's totally your discretion whether you want to give it to her or not, correct? Yes. It's a. Well, I'm not sure that those two things are consistent, that it's abandoned and it's yours. I mean, it's abandoned. Right. Anybody. I take it your position is anybody could come along. If I saw that there was a toothbrush there that I wanted, I could just pick it up. It's correct. Not likely because it's abandoned. I think whoever grabs it, it's their property. It's abandoned. Right. So why couldn't she take it to the pod? I don't doubt that she couldn't have. I thought it was countermand that said, no, no, no. I've been instructed this has to go up to Pennsylvania to the dump. You can't have it. That wasn't countermand. When she said, I'm ready, I made arrangements to have it. And they said, no, you can't have it because we have instructions to take this to the dump. We're going to dump your stuff in another state rather than give it to you right now. Is that the facts? I want to make sure you're the counselor. I don't believe those are the facts. What are the facts? The fact that my clients were hired to take this stuff. Right. Off the premises and to a dump. But the answer to that was, didn't she say she was ready to put that in the pod? And she was told, no, you wouldn't do it? That's not the facts? Well, there isn't anything alleged about her having a dump truck there or a truck to take it. To the best of my knowledge, there's no allegation that she has anything there to take anything anywhere else. There's an allegation that she made some type of negotiation with someone about moving these materials. That's not including my client. My client's not really a part of all that. He's simply tired of moving things from one place to another. The possession statement or argument that we made, or you and I discussed, is simply because he happens to be holding abandoned property. If you're going to take the person, someone has to own it. It's the person who has it. If you find a quarter on the street, it becomes your quarter. That's what I said. That's why it belonged to you. Correct. So, for instance, if she had asked, we could have given it to her or could have not given it to her. It's abandoned property and we've possessed it now. My client is a stranger to this case who comes to do a job. I don't think he had any particular desire to keep or not keep this stuff from this woman. But his job is to get it off the premises. Is there an allegation that she offered to pay you to take it to some other place? There is an allegation that a negotiation was made.  So there's no allegation that she offered to pay your client to take it to some place? She didn't offer my client. There was some type of negotiation with other people. I understand that. And I also understand my question. There's no allegation that she offered to pay your client to take it to some place? That is correct, Your Honor. Okay. Can I ask a question about the, because this has confused me. So, I guess it's the second order, the district court says, well, but these boxes were not abandoned. So that's a different matter. But I'm kicking that one out anyway because the amount of damages sought is too high. I don't understand that. Well, I think that speaks to the issue in Maryland law with regard to conversion. There's got to be some type of market value of damages. And the same exact number, the $3 million, is in both places. Okay. I have two questions about that. Here's the first one. Why shouldn't the number be the same? Because she's still appealing, right, on the district court's first order. She actually does want damages even for the furniture because she thinks the Baltimore Code was read wrong and that they're not abandoned. So why should she change the amount of damages? Do you know what I'm saying? I know what you're saying. I don't, I took it, and, again, it's Why does she have to give up? It's still on appeal. I understand that. And it's mildly confusing to me because when I looked at that, I was quite unsure. We're talking about all these things? Right. Or just these extra boxes? With regard to the extra boxes, which are the only ones that, I'll try to force that in there, those extra boxes, the ones on the second complaint, which are plural. I don't know if there's two, 10, 500 boxes. Right. And we don't know what's in those boxes. The only thing She says what's in them, right? She says these are documents that I used in my court or that I need for my court case. Correct. And my theory of actual damages is I lost my case because I didn't have the documents. I mean, what do you need, like an index of documents? Well, we need to know what those documents are, but those documents have to have a market value under Maryland law. Right, but can't that happen at trial? Like, is there a good authority for at the motion-to-dismiss stage, the district court has to figure out exactly what's in the boxes, what are the documents, what did each document go to? That just seems weird at the motion-to-dismiss stage. Well, I think with the conversion issue, I mean, you're trying to find out. Conversion, if you look, for instance, into Maryland jury instructions, they liken conversion to a forced sale. So in that sense, I would think I totally get there's going to have to be a proof of value at some point, but really on the pleadings and motion-to-dismiss? Well, again, we're talking about papers here, and I think one of the things we indicated in our brief is that it's kind of a common sense that we're just talking about actually, literally, papers. What if she pled always in excess of $75,000, which is what lots of people plead? I tried to do that myself, actually. Right. I mean, as far as the difference in the damages amount? Yeah. I don't know that she's illustrated any difference from the before pleading and the after pleading other than these several boxes. Right. Okay? Right. And that they had papers relevant to her litigation. But the district court wouldn't have been able to dismiss her on that theory if she'd said in excess of $75,000. Under that numerical theory, correct. No. So what would be the basis for dismissing? You mean from a numerical standpoint? I'm not sure if I'm following you. I thought that was the basis of the district court's refusal of that claim or rejection of that claim. Am I wrong? That was an aspect of it, I believe, yes. I thought it was the aspect of dismissing the second amended complaint with respect to that claim. Yes. So if that basis goes away. Well, I still think there has to be some type of market value for these items, which we don't have that. We have this generalized number there. In conversion, we're talking usually about specific items with specific amounts. We don't have that here in this case. And there's no real description of the items other than the fact that there are papers involved in the litigation. As I think Mr. Stelman talked about, there was a trial coming up. The case was dismissed in January. It maybe doesn't speak to this issue at this point in time, but we have a situation in which we have a plaintiff alleging that the defendant stole her important documents. Nobody bothered to make mention of any other case. And for sure, a trial, that's going to be a really good argument, as this case progresses. But I'm still struck at the idea that we would have to have this argument on a motion to dismiss. And I'm sorry, can you just go back to my original question, too, because it really was two questions. If she's still seeking damages for the stuff in her apartment, she's still appealing that part of the ruling, what's she supposed to do, notch it down now, and then if she wins on appeal it goes back up to $3 million? Do you know what I'm saying? I understand what you're saying. And again, my impression of it may be somewhat different in the sense that, along the lines of what Judge Berdara had said, is that the amount that we made these teeny tiny changes about adding a few boxes to segregate it away, and she kept with the same amount, which doesn't give us notice, us being the defendant. Did you make that argument in front of Judge Berdara? I bet you didn't. I believe we did, but I can't tell you off the top of my head. We can go back and look at this. Yeah, I don't want to make a promise that I did or didn't. I bet you never made that argument. Okay. All right, I think my time is up. It's the red light. Yes, it is. I'm sorry, I've gone over. Do we have other questions? Thank you. Okay, thank you. Ms. McGowan, do you represent the sheriff? Is that who you represent? I do, Your Honor. And you say that he has immunity. Among other things, yes. That's a good one. If he's got immunity, you don't have to get to the other things, right? Well, and interestingly, Judge Berdara did not reach the issue of immunity, but we had raised it below and continue to stand by this very important, overarching principle. I would point out that just with respect to Lieutenant Kelly, there are essentially three reasons why the district court's judgment should be affirmed. And the first and most important is that there are simply no allegations that Lieutenant Kelly exercised any dominion and control over any of Ms. Hall's property as required to state a conversion claim, nor are there any allegations that he had any supervisory responsibility for or authority over PSN personnel. Secondly, with respect to the property that was removed from the apartment during the eviction, the district court properly found that under the Baltimore County Code, the property was abandoned. And then finally, as you alluded to, Your Honor, the complaint fails to allege any facts from which one could infer that Lieutenant Kelly acted with actual malice or gross negligence in executing the writ. And for this reason, he's entitled to statutory state personnel immunity, which would bar both the common law tort claim and the constitutional tort claim. Shouldn't we remand this? As you said, the court didn't look at this. Shouldn't in the first instance, district court look at the question of immunity? Well, that's not necessary, Your Honor, for two reasons. One, it is again an analysis based on the complaint. And for that reason, under the Brewster versus Lynchburg case, the appellate court can affirm on different grounds than those cited by the district court, but which were clearly raised below on the papers. On grounds, but those are grounds where they did on the marriage, reach it on the marriage. We can do it on different grounds, but here it wasn't. It was just ignored in totality. Well, there were other reasons, other bases to dismiss. This is just an alternative basis for dismissing as against Lieutenant Kelly. And one that of course, uh, is generally very effective in this particular case. This court is perfectly capable of also looking as we had suggested, the district court do looking at the allegations in the amended complaint to see whether or not they state with any specificity, any basis for asserting that Lieutenant Kelly acted with actual malice or gross negligence. And in this particular instance, the only allegations that are cited, uh, by the plaintiff are that, uh, Lieutenant Kelly evidenced a wanton disregard for Ms. Hall's verbalized intent, not to her band and her abandoned her property. There's no allegation that there was any deficiency with respect to the writ of position of possession, or that he in any way acted outside of the writ. Uh, the only allegation I think was just made, uh, by counsel, uh, plaintiff's counsel in his opening statements, uh, something to the effect of. I wrote this down, um, that, uh, Lieutenant Kelly interceded in the agreement to transport the property to a storage site. There is no allegation to that effect whatsoever in the amended complaint. And I would point out to the court, uh, at the joint appendix, uh, page two 14, uh, paragraph 22. Again, that's the paragraph dealing with the allegations with respect to this alleged agreement. Lieutenant Kelly is not referenced at all in that paragraph, except to say that after this agreement falls apart, uh, where a fair reading of this complaint is that the Lieutenant interfere with her, being able to get her properties into her park. Uh, no, respectfully, your honor. That is not at all. What is alleged in the amended complaint.  I refer the court to, uh, page two 14. You said you used the word interceded. Didn't you? That's what he said today. The complaint does not say that at all. The complaint says following their witnesses, their witness of these actions by PSN landscaping and pursuant to their own intervention to deputy sheriffs on site at the premises, inform us all that they had negotiated an agreement with encouragement of attorney Covey. He where, whereby PSN landscaping would take their property to the portable storage unit in return for cashier's check in the amount of $600. Ms. Hall immediately proceeded to the bank and obtained a cashier's check. However, upon her return and presentment of the cashier's check, Stuart Seagal, Esquire counsel for gray star indicated that the agreement was terminated and that PSN landscaping would not take her property to the portable storage unit. Mr. Seagal, who had been on site from the outset and actively participating in the eviction, continued giving orders to the PSN landscaping employees as they continued to load missiles property onto the trucks whereupon Lieutenant Kelly vacated his post and left the premises. That is the only reference with respect to Lieutenant Kelly during any part of this, uh, uh, a Daniel to honor the agreement. So again, there's simply no evidence whatsoever, no allegations whatsoever that a Lieutenant Kelly had anything to do with this agreement. Uh, and likewise, no allegations of rise to the level of malice. One of the problems, the deficiencies in the complaint is that the only thing he's actually the only act Lieutenant Kelly has actually, uh, alleged to have engaged in, it was to advise miss hall where the dump truck was going. And apparently that information was incorrect. Why was the sheriff there? Well, the ship and I'm glad you asked that your honor, because I think it's important to put the context of how, how, um, evictions are handled in Baltimore County, Maryland. The sheriff is there for two reasons. One to execute the writ and to ensure the peace. They do not physically remove the items from the premises that is actually done by the landlord. And so when a, when an eviction is scheduled, the first thing that happens is the sheriff's office does a warrant check and a gun check. So they sort of know what they're going into. They contact both sets of parties so that the landlord is aware of when, and this is going to be scheduled. They also contact the tenant. If they aren't able to contact the tenant, they will then post up, uh, post the, uh, writ on the premises. In this case, they contacted miss hall apparently twice. They scheduled the eviction and the landlord is required to bring eight to 10 movers and a locksmith. And then at the eviction, they're there basically to serve the notice of the writ and ensure that, you know, no harm comes to anyone during the course of the eviction. They award possession of the real property to the owner and the personal property is removed by the landowner. And the other thing they do is that if cash is found during the course of the eviction and the owner isn't present, they will take the cash and complete a property form. If controlled dangerous substances or weapons are found during the eviction, those are seized and turned over to the Baltimore County police department. So their function is not physically to remove this stuff. Their function is to make sure that, you know, that there's, there's no incidents, that there's no fisticuffs going on, that there's not a brawl, that no one is injured. Uh, they're there as a, you know, to execute the court's order, but not necessarily to actually physically move the items. And so in this case, there's simply no allegations that, uh, Lieutenant Kelly touched any of the property, exercise dominion and control of the property or did anything that smacks of malice or gross negligence. And so for that reason, he would be entitled to, uh, person, uh, statutory personnel, uh, immunity under the Maryland court claims act and under the courts and judicial proceedings article section, uh, five, five, two, two. Did you have another question about that particular issue? No, no, you, you, I do not. Thank you. I think any other questions with respect to this client? No, I think we understand. We ask that you affirm. Thank you so much. Thank you. Thank you.      Thank you. Thank you. Thank you. Thank you. Thank you. Good morning, your honors Adam consciousness on behalf of the appellant. Uh, I'd like to, uh, address some of the arguments brought up by the appellees. Uh, first on the FHA claim, the appellees are relying solely on the, this temporal proximity, this 10 months between the filing of the HUD complaint. And the ultimate eviction, but we have never sought to rely on temporal proximity alone. I understand that, but the cases put some significance on temporal proximity. In fact, I haven't found a case where the last protected act was 10 months before, um, the found to be a basis for a cause of action in retaliation. And if you have one, I'd be grateful. I do. And in cases where, the case is, uh, in, uh, some cases that we cited in our brief King V Rumsfeld, a fourth circuit case from 2003, the site it's more than 10 months. Uh, in that case, they say when the, uh, temporal proximity is based on a natural decision point. And in essence, the adverse action cannot take place earlier because at the end of, let's say a review term, uh, for a teacher who ends up getting a negative review, or in this case, even more so a court process, which Ms. Hall has begun and continued to advocate her rights culminating in an eviction, which is scheduled delayed, of course, by various court proceedings, and then occurs 10 months later. Uh, the natural decision point at which action can take is no earlier than that point. That is assuming that challenging the eviction is a protected activity. And I'm not so sure about that. I would have said her action before the state human relations commissioner, whatever it is, is a protected activity. Um, they, they rejected her claim. Did she appeal it? Uh, she continued to pursue that claim in circuit court, but the filing of the protected, the filing of the HUD complaint is indeed a protected activity. And that was 10 months before. Yes. I'm not sure. I understand the natural. I understand what King said, but I'm not sure it's applicable to this. The filing of the HUD complaint pertained to a pattern of conduct towards Ms. Hall that occurred before that, that all related to her disability. You don't forevermore have a retaliation complaint. The question you asked earlier, you asked a question earlier, um, about what facts, um, uh, connect this to disability, the causal connection. I didn't ask the question, but my good colleague did, but I'm happy to have the answer to that question. In the, in a case we cited in our brief Smith versus Housing Authority of South Bend, the plaintiffs complained of various adverse actions that affected their disability here. Ms. Hall complained about removal of property from a storage unit, which she had as a reasonable accommodation for her disability. She also complained about being denied a three bedroom apartment, which was an accommodation for her disability. Then, uh, the eviction process started. Uh, she filed her HUD complaint that 10 months go by. There is no earlier time for the ultimate, uh, conduct of removing her property and transporting it to a, uh, a landfill to occur. So I, I mean, so I under, I think I understand your argument that 10 months, it seems like a long time, but it was the first chance the landlord had. So they just had to carry the grudge for the full 10 months. But is that really realistic when you're talking about a landlord and a tenant? I mean, I would think there'd be all kinds of ways a landlord can make a tenant's life difficult, including a bunch of the ones you just mentioned, but that happened earlier. Like you can take her stuff out of the storage unit. There's all kinds of ways. I mean, landlords have so much power over tenants. It's hard for me to believe that a landlord who wanted to kind of punish a tenant would have to wait 10 months to do it. They just don't, you know, they don't fix the toilet when it breaks. I think there's nothing at all alleged, right? 10 month period, just silence. There's cases that say even as long as two years, of a time period, there's a case, a Templeton versus first Tennessee bank out of the fourth circuit in 2011. They're a two year time span before retaliation was ended up being the natural decision point at which retaliation could occur. I was efficient. I mean, it was not, that's sort of what I'm hung up on. Right. My own. In the, in King versus Rumsfeld, they talk about a teacher being subject to a year end valuation at that point, getting a, a negative evaluation and they understand that this isn't really a natural point. That's, that's the problem. I think as my colleagues said, you, they have landlords and tenants. Right. Maybe everybody in this room has been a tenant at some time. Maybe some people have been landlords, but there's an ongoing relationship. You know, it's not like it's a natural, many, maybe landlords would like there to be natural breaking points, but there's ongoing relationship. Your, your sewer is wrong or the curtains don't work or there's noise and there's back and forth. Sure. And the natural, maybe the term natural is not as helpful, but the scheduled time to take the ultimate action of removing her property and transporting it to a landfill was scheduled for that date and could occur no earlier. It was followed along a litigation process following various appeals. I'd like to address some of the other, um, but council, wasn't there an agreement not to take her, not to take possession for, for later date? Uh, correct. There was an agreement, uh, not to, um, uh, to take possession of the pro of the premises and let her stay a little longer. Wasn't there an agreement? Indeed. And she actually paid rent, uh, for the month of December, which was accepted. Right. Well, why? So isn't that, that's a, that's a novation, isn't it? That's what we used to call it. I was in law school, you know, it's a novation in the sense that we, it's a new contract in a sense that you agree by accepting as a consideration paid and they agree. And they evicted her before that time, didn't they? They did, but that was all it, the court gave her, you know, it's really, we can go back and read the record. And so we'll know the records. It's really helpful to us if you're honest in answering, because as I read the record, the court said, okay, she'll be out right away. And the landlord said, no, we're going to give her additional time. Is that not what happened? Uh, I believe that is what happened, but the, um. And of course she did pay for the additional time, but generally in this world, we do have to pay the landlord, unfortunately. I, I think what was the important part is. She did pay, but had the date come for the end under the new agreement at the time they evicted her? No. Exactly. But the important part of this is that, uh, we're, we are trying to engage in this fact finding process. And we have, we're talking about what, what was said in the complaint. And you don't argue that they evicted her before the time that she was correct. We're allowed to do under the court order. And we're not contesting the validity of the court order. We're contesting the manner in which the eviction took place too. But why didn't you do that? Why didn't you do that in this case? Why didn't you, why didn't you, I think the, uh, egregious nature of the way in which her property was removed, uh, is telling, uh, for property for a tenant who expects, uh, her property to be placed on the landlord's property outside on the premises, not to be taken to a landfill out of state. And then it being directly, uh, put onto trucks. And, but the problem is your, your fair state of Maryland allows that kind of thing. It seemed like, say, well, it's abandoned. Well, I think the uncertainty, the uncertainty that we have, uh, in the Baltimore County code begs this question for a more thorough analysis of the interpretation of that code. The single Maryland case, which says that the tenant has rights under that provision. There are no cases interpreting that provision. The, uh, Pelley's suggestion by anybody ever. It's not, it's written. I mean, it's a regulation on the landlord. It's, it doesn't give rights to the tenant, right? It doesn't give rights to the tenant, but, uh, the expectations should be clear, uh, as to what is going to happen with the property. Uh, I think we have found uncertainty with that code in their briefs, the appellees, uh, sites of the Baltimore city code, which I think is very different and serves different. So you still haven't, please answer my question. Knowing how somewhat draconian the law might be in Maryland, in that regard, in terms of abandonment, and you don't have to do anything. Once you do it, it's an abandoned property. Why wouldn't you raise that? The agreement made with your client was violated. Not withstanding what that was, they violated because she had paid to stay at a longer date and they violated you. That you don't think that's important in this case. I think it's important, but I think it's one of, uh, of many facts that are pled in our complaint that, uh, show this story of what's occurred over what the appellees have even said, said six years of the appellants experience, uh, at this, uh, location. And indeed the pleading standard is not, uh, pleading, uh, to the code or pleading conclusive reality allegations. It is indeed pleading facts that tell a story that raised a plausible, uh, right to relief. What did you, what did you plead against the share? The Lieutenant, uh, against the sheriff. He, uh, we pled that he was there supervising the, uh, what's wrong with supervise. He's required to keep the peace. Indeed. He is required to, uh, keep the peace and our allegations state that that did not happen. Rather. What did you allege that he did that? He, uh, abandoned his post and the two, uh, deputy sheriffs, uh, supervised the removal of her property in contrary, contrary to the agreement to transport it to a storage unit. What was the agreement you allege? Uh, $600 to transport the property to whom, uh, PSN, uh, landscaping. It was with PSN landscaping to transport the property to a storage unit. And the Lieutenant was a party to that agreement. Uh, the suit, the Lieutenant is there to, uh, ensure the orderly, uh, eviction process. Uh, and I believe that, you know, it's an old saying, the law won't do for you what you won't do for yourself. You have to plead these things. Uh, Your Honor, I think the, the, the telling of this story, uh, it certainly raises, uh, uh, a plausible claim of relief in light of Swierkiewicz and McCleary Evans is, is not. Your Honor. I think you far exceeded your time. Thank you very much. Uh, we will come down and greet the lawyers and then take a brief recess. This honorable court will take a brief recess. Thank you.
judges: Diana Gribbon Motz, Roger L. Gregory, Pamela A. Harris